IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 1, 2020

## STATE OF TENNESSEE v. JIMMIE LIDDELL

**Appeal from the Criminal Court for Shelby County**
**No. 17-05045    Lee V. Coffee, Judge**

_____

### No. W2020-00235-CCA-R3-CD

_____

The Defendant, Jimmie Liddell, was convicted by a Shelby County Criminal Court jury of four counts of aggravated sexual battery, a Class B felony; one count of attempted aggravated sexual battery, a Class C felony; and one count of solicitation of aggravated sexual battery, a Class C felony. *See* T.C.A. §§ 39-13-504 (2018) (aggravated sexual battery), 39-12-101 (2018) (criminal attempt), 39-13-528 (2018) (solicitation of a person under eighteen years of age). The trial court imposed an effective sentence of 110 years. On appeal, the Defendant contends that the evidence is insufficient to support his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Phyllis Aluko (on appeal and at trial), District Public Defender; and Tony N. Brayton (on appeal) and Mark K. Kent (at trial), Assistant District Public Defenders, for the Appellant, Jimmie Liddell.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; Dru Carpenter, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Defendant's convictions relate to the sexual abuse of six children at a gathering on April 9, 2016, at the apartment shared by the Defendant and his brother.

At the trial, Shannon Hamer testified that she was the mother of five children, including three of the victims: J.S., K.C., and J.H.[1] She stated the ages of each of these victims, all of whom were under age thirteen on April 9, 2016.

Ms. Hamer testified that in April 2016, she and the Defendant had been restaurant coworkers and had known each other for about one year. She said they had been friends and that they socialized in each other's apartments, which were within the same complex. She said the Defendant and the Defendant's brother lived together.

Ms. Hamer testified that she had worked on April 9, 2016, and that the Defendant had requested and received a day off. She said her husband was babysitting three children of family friends. These children were victims R.C.1, R.C.2, and R.C.3. Ms. Hamer said her husband was also caring for their children and had planned to take all the children to a park. She said that a couple of hours into her work shift, she learned from her husband that the Defendant and the Defendant's brother had invited her husband and the children to their apartment.

Ms. Hamer testified that she went to the Defendant's apartment around 7:30 to 7:45 p.m. She said several children were present. She identified the adults present as Ebony Isom, the Defendant, the Defendant's brother, and Ms. Hamer's husband. She said her husband was grilling food and walked between the apartment and the grill outside. She said the Defendant's brother sat on the living room couch with one of her children. She said that two children played outside and that R.C.1, R.C.2, R.C.3, K.C., J.S., J.H., and C.H. were in the Defendant's bedroom playing video games with the Defendant. She said R.C.1 sat on the Defendant's lap. She said she did not see anything unusual or notice the Defendant's clothing being "unfastened or half off."

Ms. Hamer testified that the children were "rambunctious" and that her family, R.C.1, R.C.2, and R.C.3 only stayed thirty minutes to one hour after she arrived. She said that she worked with the Defendant a few times after April 9, 2016, and that around this time, the Defendant asked if her son J.H. could stay overnight at his apartment. She said she refused because J.H. was age eight at the time and because the Defendant did not have children of his own.

Ms. Hamer testified that around April 14, 2016, she spoke with the parents of R.C.1, R.C.2, and R.C.3. Ms. Hamer said she also spoke with her children. She said Ms. Isom and her son came to Ms. Hamer's apartment along with the family which included R.C.1, R.C.2, and R.C.3. Ms. Hamer said the police were called. She said she took her children to the Child Advocacy Center for interviews about one month later.

---

[1] We identify the victims of sexual abuse by their initials.

J.S., age nine at the time of the trial,[2] testified that when he was age five, "Jimmie" had touched J.S.'s body parts when he and Jimmie were in Jimmie's bedroom. J.S. said other adults, including his parents, were in the apartment at the time. J.S. said that he and Jimmie were in Jimmie's bedroom alone, that Jimmie told J.S. to sit on Jimmie's lap, and that Jimmie touched J.S.'s "private" with Jimmie's hand. J.S. marked an anatomical diagram to show where Jimmie touched him, and the diagram was received as an exhibit. The diagram showed circles on the genital and buttocks areas of a child. J.S. said Jimmie touched him in the areas indicated on the diagram under J.S.'s clothes.

J.S. testified that he saw Jimmie inappropriately touch J.H., R.C.1, R.C.2, and R.C.3 in Jimmie's bedroom on the same date. J.S. said each of the children sat on Jimmie's lap when the inappropriate touchings occurred. When asked what parts of the other children's bodies Jimmie touched, J.S. said, "The same." J.S. said that he was not in the room when Jimmie touched the other children but that J.S. saw it because he was "[i]n the doorway." J.S. said that when he saw Jimmie inappropriately touch J.H., Jimmie and J.H. were alone together in Jimmie's bedroom.

J.S. testified that he told his mother the same day about the incident, that the police were called, and that he and his family went home. J.S. said he was interviewed about the incident. He identified a disc containing a recording of the interview, which was received as an exhibit. In the recording, J.S. stated the following: He was in "Uncle Jimmie's room" when Uncle Jimmie "kept digging in [J.S.'s] pants" with Uncle Jimmie's hand and "kept touching [J.S.'s] body parts." Referring to a diagram, J.S. identified his buttocks and genital area as the places Uncle Jimmie touched. J.S. said Uncle Jimmie moved his hand when he touched J.S.'s buttocks and genital area and that Uncle Jimmie's hand stayed outside his buttocks. J.S. said that Uncle Jimmie sat in a chair and that J.S. sat in Uncle Jimmie's lap as the touching occurred. J.S. said that J.H. also sat in Uncle Jimmie's lap and that Uncle Jimmie "did the same thing" to J.H. as he had done to J.S. J.S. said that R.C.1, R.C.2, R.C.3, and another child who was not a subject of the indictment in this case also sat in Uncle Jimmie's lap and that Uncle Jimmie did "the same thing" to them. J.S. said that other children were in the room playing video games when Uncle Jimmie touched him. J.S. said he told his parents about the incident the same day it happened.

J.H., age twelve at the time of the trial, testified that he went to the Defendant's apartment once. J.H. said that the children played video games in the Defendant's bedroom and went in and out of the room, with some of them going outside periodically. J.H. said that while he and the Defendant sat on the Defendant's bed, the Defendant told him that when J.H. was ready, J.H. could "stick . . . [his] penis in [the Defendant's] butt." J.H. said

---

[2] The trial took place in August 2019.

that the Defendant told J.H. to kiss the Defendant and that the Defendant "forcefully grabbed" J.H.'s head and kissed J.H.'s mouth. J.H. said J.S., R.C.1, R.C.2, R.C.3, and K.C. were in the room when this occurred. J.H. said that while J.H. sat in a chair in front of the Defendant, the Defendant asked J.H. to "sit closer to" the Defendant's penis. J.H. said he scooted forward in the chair to get away from the Defendant and moved to sit in the floor. J.H. said that K.C. and J.S. were in the room when the Defendant tried to get J.H. to sit closer to the Defendant's penis and that he thought R.C.1, R.C.2, and R.C.3 had been in the room, also.

J.H. testified that while he was in the Defendant's bedroom, he thought the Defendant "sticked his . . . fingers in [K.C.'s and J.S.'s] butts." J.H. based his opinion on his having seen the Defendant's thumb "poking out of" K.C.'s and J.S.'s pants and not having seen the rest of the Defendant's hand. J.H. said that when he saw the Defendant's hand in K.C.'s pants, the Defendant was sitting in a chair and K.C. stood in front of the chair. J.H. said that the Defendant asked K.C. to sit on the Defendant's lap but that J.H. told K.C. "no." J.H. said that when he saw the Defendant's hand in J.S.'s pants, J.S. sat on the Defendant's lap. J.H. said the other adults were in the kitchen when he observed these events. J.H. said that before the Defendant put his hands in K.C.'s and J.S.'s pants, the Defendant told J.S. to bring the Defendant a container of baby oil, which the Defendant applied to his finger.

J.H. testified that after he and J.S. ate, they were in the Defendant's bedroom with the Defendant and that the Defendant again asked J.S. to sit on the Defendant's lap. J.H. said the Defendant "tried to stick his fingers in [J.H.'s] butt."

J.H. testified that the Defendant had been clothed and that the Defendant's pants had been zipped during these events. When asked if the Defendant's pants had been unzipped at any point, J.H. said, "No, I don't remember. I don't know."

J.H. testified that he told his parents about what happened after R.C.1, R.C.2, and R.C.3 told their parents. J.H. said he thought this happened the day after they had been at the Defendant's apartment. J.H. said that the adults were mad and that the police were called.

J.H. testified that the adults drank alcohol at the Defendant's apartment. J.H. said he thought the Defendant tried to get the other adults drunk so the adults would check on the children less frequently.

J.H. identified a disc containing the recording of his forensic interview. The disc was received as an exhibit. In the interview, J.H. stated the following: A "gay dude" named "Jimmie," who used to work with J.H.'s mother, tried to make J.H. "get gay." J.H. said that Jimmie said he liked boys and girls, that Jimmie told J.H. to kiss him on the mouth,

-4-

that J.H. ignored Jimmie, and that Jimmie grabbed J.H.'s head and kissed J.H. "on the lips." J.H. said Jimmie "almost broke [J.H.'s] concentration" on a video game when Jimmie said, "Sit on my lap," and "Sit on my d---." J.H. said that he had been sitting in a chair with Jimmie, who sat behind J.H., that Jimmie touched J.H.'s waist with Jimmie's "middle part," and that J.H. scooted forward in the chair and moved to the floor after Jimmie said, "Sit on my d---." J.H. said J.S. sat on Jimmie's lap after J.H. moved to the floor. J.H. said that Jimmie told J.H. that when J.H. was ready, J.H. could "stick his dingaling in [Jimmie's] butt." J.H. said Jimmie told all of the children to sit on Jimmie's lap. J.H. said some children complied and some scooted forward or sat on the floor. J.H. said that Jimmie stuck Jimmie's fingers in J.S.'s and K.C.'s butts, and tried to make J.H.'s cousins, brothers, and sisters sit on his lap. J.H. said Jimmie had J.S. retrieve "grease" from the bathroom, which Jimmie put on Jimmie's fingers before inserting them in J.S.'s and K.C.'s butts. J.H. said that Jimmie told the children, "Don't tell anyone," that the adults were outside or in the kitchen, and that Jimmie tried to get the adults drunk.

R.C.3, age 13 at the time of the trial, testified that she and her two brothers spent the night with family friends the night before the events that occurred at the Defendant's apartment. R.C.3 said she and her brothers went to the Defendant's apartment with the family friends. She said that when she was introduced to the Defendant, he hugged her and touched her "behind." She said that after eating, she and the other children played video games in a bedroom. She said that the Defendant was in the room and that he inappropriately touched the children. She said the Defendant asked all the children to kiss him. She said the Defendant told the children "not to tell nobody what had happened." She said the Defendant gave her liquor, "slid his hand down [her] back trying to touch [her] behind," and made her brothers "do other things." She said the Defendant was unable to touch her "behind" because she left the room.

R.C.3 testified that the Defendant told R.C.2 to kiss the Defendant, that R.C.2 kissed the Defendant's cheek, that the Defendant told R.C.2 to give the Defendant a "real kiss," and that R.C.2 kissed the Defendant's lips. She said that the Defendant made R.C.2 sit on the Defendant's lap and that she did not see "anything happen" while R.C.2 sat on the Defendant's lap. She said she did not see anything involving the Defendant and the children other than R.C.2. She said she was in and out of the room and that some of the other children remained in the room to play video games.

R.C.3 testified that after they went home and before they went to bed, the children talked about the Defendant's having touched them inappropriately. She said that the children continued to discuss the Defendant's actions and that she and her brothers told their father three days after the gathering about the Defendant's actions. She said they did not report it sooner because the Defendant told them not to tell anyone.

-5-

R.C.3 identified a disc containing her forensic interview. The disc was received as an exhibit. In the interview, R.C.3 stated the following: A man named "Jimmie" put his hand behind her neck and tried to touch her "behind" when she was at his apartment. She said "all the children" were in Jimmie's room playing with an Xbox and that Jimmie tried to touch all of them. She said Jimmie kissed R.C.2. She said that Jimmie tried to touch her butt but that she moved to the floor. She said that Jimmie wanted her to kiss him but that she said, "No." She said that Jimmie asked R.C.2 to sit beside him and that Jimmie kissed R.C.2 on the lips. She said Jimmie tried to kiss and touch the other children. She said she saw R.C.1 sit on Jimmie's lap after Jimmie said, "Come sit right here," and that she saw Jimmie touch R.C.1's butt with Jimmie's hand. R.C.3 said that the children reported the abuse three days later and that the police were called.

R.C.1, age ten, testified that when he was age seven, he was at his parents' friends' house with his siblings and his "cousins." He said that he was at "Nick and Shannon's" house, that they did not go to anyone else's house, and that they had a barbecue. He said that while he played video games, a man he had never met previously and whose name he did not remember touched him on his "middle part" and his "behind" underneath his clothes and kissed him on his lips. R.C.1 said J.H., J.S., K.C., and C.H. were present when this occurred. R.C.1 said the adults were in another room when this occurred. R.C.1 said he told his parents about the events a few days later. He said he did not reveal it initially because the man told him to keep it a secret.

R.C.1 identified a disc containing a video recording of his forensic interview, and the disc was received as an exhibit. The recording reflects that R.C.1 stated the following: A man whose name R.C.1 did not recall touched R.C.1's "middle part" and "behind" inside R.C.1's clothes with the man's hand. R.C.1 said the man told R.C.1 to kiss him and sit on his lap. R.C.1 said he kissed the man "on the mouth" and sat on the man's lap. R.C.1 said this occurred while he played games in the living room at "Nick and Shannon's house." R.C.1 said the man lived beside Nick and Shannon. R.C.1 said that the man asked R.C.1 to touch the man's middle part but that R.C.1 did not. R.C.1 said the man also touched J.H.'s middle part and behind. R.C.1 said that the man asked R.C.2 to "stick his tongue down" the man's throat but that R.C.2 did not. R.C.1 said he saw the man touch all of the children's middle parts and behinds. He identified the other children present as R.C.2, R.C.3, J.H., K.C., and two children who were not identified as victims in the indictment.

R.C.2, age eleven, testified that when he was age eight, he was at an apartment with his siblings, his friends, his friends' parents, a man named "Jimmie," and Jimmie's brother. R.C.2 said the children played video games in Jimmie's bedroom, while the adults other than the Defendant cooked. R.C.2 said Jimmie "was sexually touching" the children, including R.C.2. R.C.2 said Jimmie touched them "in our posterior" and made them kiss him and put their tongues in his mouth. R.C.2 said he meant "behind" when he said "posterior."

R.C.2 testified that Jimmie told him to kiss Jimmie and to put his tongue in Jimmie's mouth. R.C.2 said he complied. R.C.2 said that Jimmie told him to sit on Jimmie's lap, that he complied, and that Jimmie's pants were unzipped when he sat on Jimmie's lap. R.C.2 said that when he sat on Jimmie's lap, he sat in a chair with Jimmie and that he was "in between" Jimmie's legs. R.C.2 said Jimmie touched R.C.2's posterior with Jimmie's hands. R.C.2 said he saw Jimmie touch all of the other children "on their posterior." R.C.2 thought Jimmie told all of the other children to kiss Jimmie. R.C.2 said that the children walked in and out of the room and that he was never alone with Jimmie. R.C.2 said he told his mother about the events about three or four days later. He said he did not tell anyone sooner because he was scared.

R.C.2 identified a disc containing his forensic interview, and the disc was received as an exhibit. In the interview, R.C.2 stated the following: He, R.C.1, and R.C.3 visited at their friends' house and went to Jimmie's house to play games. He said Jimmie touched his, R.C.1's, and R.C.3's private parts but did not touch his or R.C.1's penises or R.C.3's vagina. R.C.2 said Jimmie touched his posterior more than once on top of R.C.2's clothes. R.C.2 said that Jimmie told the children to hug and kiss him and that they hugged him but did not kiss him. R.C.2 said that he, J.H., K.C., J.S., R.C.1, R.C.3, and three children not identified as victims in the indictment played games in Jimmie's "room" and that Jimmie asked the children to sit in his lap. R.C.2 said that Jimmie's pants were unzipped but that he did not "see anything." R.C.2 said Jimmie touched R.C.1's posterior and penis more than once. R.C.2 said Jimmie touched R.C.3's posterior. R.C.2 said Jimmie touched K.C.'s posterior inside her clothes as she sat on Jimmie's lap. R.C.2 said Jimmie touched J.S.'s penis and posterior outside J.S.'s clothes. R.C.2 said Jimmie asked R.C.2 and J.H. to "stick [their] tongues down" Jimmie's throat. R.C.2 said Jimmie asked the children to kiss him and that R.C.2, J.S., and R.C.1 kissed Jimmie. R.C.2 said the children waited four days to report Jimmie's actions.

Ramon Callicutt, Sr., testified that he had three children and that he was married to Rosalyn Callicutt. He said his family used to live next door to the Hamer family and had remained friends. Mr. Callicutt said that when he and his wife worked overnight, their children stayed with the Hamer family and that he and his wife sometimes babysat the Hamer children. Mr. Callicutt said the Hamers were no longer his neighbors in April 2016, when the events relevant to this case occurred.

Mr. Callicutt testified that he met the Defendant at the Hamers' apartment. Mr. Callicutt identified the Defendant in the courtroom.

Mr. Callicutt testified that he dropped off his children with Nicholas Hamer on the afternoon of April 9, 2016, because the Hamers were going to babysit while Mr. Callicutt and his wife worked. Mr. Callicutt agreed that he took the children to the Defendant's

apartment, which was in the same complex as the Hamers' apartment, at the direction of Mr. Hamer. Mr. Callicutt said that Mr. Hamer, the Hamer children, and the Defendant were present when Mr. Callicutt dropped off the Callicutt children.

Mr. Callicutt testified that after he completed work, he returned to the Defendant's apartment around 8:00 or 9:00 p.m. Mr. Callicutt said that Mr. Hamer, the Defendant, Ms. Hamer, and people he did not know were present. Mr. Callicutt said that the adults talked outside and that the children watched television in a back room. Mr. Callicutt said that he, his children, and the Hamers left the Defendant's apartment and went to the Hamers' apartment at an unidentified point, that Mr. Callicutt went home late, and that Mr. Callicutt's children spent the night with the Hamers.

Mr. Callicutt testified that he learned a day or two later from his wife that "something had happened at the barbecue." Mr. Callicutt said the children talked to his wife but did not relate the events directly to him. Mr. Callicutt said he and his wife met with the Hamers about the situation. Mr. Callicutt said that "Ebony" stayed with the children while Mr. Callicutt, Ms. Callicut, Mr. Hamer, and Ms. Hamer went to the Defendant's apartment. Mr. Callicutt said the situation became heated at the Defendant's apartment, that the neighbors called the apartment complex's security guards, and that his wife called the police. Mr. Callicutt said he talked to the police officer who responded and had no further contact with the Defendant.

Rosalyn Callicutt testified that she had three children: R.C.1, R.C.2, and R.C.3. She specified their dates of birth, and all were under age thirteen on April 9, 2016.

Ms. Callicutt testified that she and her family were close friends of the Hamers in April 2016. She said the adults babysat each other's children frequently.

Ms. Callicutt testified that she was at work on April 9, 2016, when her children went to a barbecue with the Hamers. Ms. Callicutt said that her husband had dropped off their children with the Hamers on April 8 before he went to work and that the children spent the night with the Hamers. Ms. Callicutt said she had been at work and had not attended the barbecue.

Ms. Callicutt testified that at some point after the barbecue, her children told her about "Jimmie" and "a lot of things [Ms. Callicutt] was just not okay with." She said that her husband was not home at the time and that she called the Hamers immediately. She thought the children revealed the information on the night after the barbecue. She said that they decided to confront the Defendant but that it was late at night and that she had to work the next day. Ms. Callicutt said they planned to confront the Defendant after she finished work the next day.

Ms. Callicutt testified that on the appointed day, she and her husband went with Mr. Hamer and Ms. Hamer to the Defendant's apartment. She said that she worked as an armed security guard and that she was in her uniform and armed. She said that they had questions for the Defendant and that the atmosphere was "terrible." Ms. Callicutt said "everybody out there . . . wanted something bad to happen to" the Defendant. She said that the Defendant's roommate threatened to call the police and that she called the police. She said that she saw an unidentified man hit the Defendant but that it had not been one of the people with whom she had gone to the Defendant's apartment.

Ms. Callicutt testified that she later took her children to the Child Advocacy Center for forensic interviews.

Memphis Police Department (MPD) Officer Chantavia Boykin testified that she responded to a call involving the Defendant on April 14, 2016. She said that when she arrived, a group of irate "complainants and parents" were present and that a heated situation existed. She said she learned some children had been "touched by someone." She said she obtained information about the allegations, ensured that the scene was safe, and forwarded information about the allegations to a lieutenant, who would forward it to the Sex Crimes Unit.

MPD Lieutenant Frankie Bradley testified that she worked in the Juvenile Sex Abuse Department of the Sex Crimes Unit in April 2016. In this capacity, she received information about allegations pertaining to the Defendant. She said that child victims of sexual abuse were referred to the Child Advocacy Center for interviews.

Lieutenant Bradley testified that she observed K.C.'s forensic interview on May 2. 2016. Lieutenant Bradley said K.C. did not disclose any sexual abuse.

Nicholas Hamer testified that he was married to Shannon Hamer and that their children were J.E., J.H., J.S., K.C., and C.H. Mr. Hamer testified that his family previously lived in Memphis and that they had been friends with the Callicutt family, who at one time had been their next-door neighbors. Mr. Hamer said he knew the Defendant as one of his wife's coworkers and a neighbor from their time in Memphis. Mr. Hamer said he and the Defendant had been "cool" and drank and discussed video games together. Mr. Hamer identified the Defendant in the courtroom and identified a photograph of the Defendant.

Mr. Hamer testified that on April 9, 2016, he had planned to have a birthday celebration at a park for a couple of his children but that the Defendant invited them to the Defendant's apartment for a barbecue. Mr. Hamer said he went to the Defendant's apartment with his children and the children of family friends. He identified the children of the family friends as R.C.1, R.C.2, and R.C.3, whom he said were in his care because he was "trying to throw a party" and because their parents were working that day.

Mr. Hamer testified that when he arrived at the Defendant's apartment, the Defendant and the Defendant's brother, Michael, were present. Mr. Hamer described the children as "rambunctious" and "in and out of the house." He said the Defendant allowed the children to go into the back of the apartment to play video games. Mr. Hamer said that he and the Defendant cooked and drank, that the Defendant went back and forth to the bedroom where the children were, and that it had been a "fun day." Mr. Hamer said that after the children were calmer than they had been, he looked in a bedroom and saw one of the children sitting on the Defendant's lap. Mr. Hamer said adults were "in and out during the day."

Mr. Hamer testified that the Defendant was in the bedroom with the children "for a while." Mr. Hamer said the children sat on the floor and shared the remote controls for the video games and that an unidentified child sat on the Defendant's lap. Mr. Hamer said that the third or fourth time he went to check on the children, he saw a child on the Defendant's lap and the Defendant's pants "unbuckled, unbuttoned, and unzipped." Mr. Hamer did not recall which child sat on the Defendant's lap when the Defendant's pants were unfastened. Mr. Hamer said that when he saw this, he "took a second guess at" himself because he had been drinking alcohol. Mr. Hamer said that although he had been drinking, he did not think he had been "completely drunk." Mr. Hamer said that he later saw the Defendant stand and noticed that the Defendant's pants were "unbuckled, unzipped, and undone." Mr. Hamer said he could see the Defendant's boxer shorts but did not see the Defendant's genitals.

Mr. Hamer testified that R.C.1, R.C.2, and R.C.3 reported the Defendant's actions to their parents and that the parents talked to Mr. Hamer and his wife "almost a week later," at which point they "started putting two and two together." Mr. Hamer said that the adults "sat [all the children] down and . . . asked what happened one by one, and all of them had similar stories." Mr. Hamer said that the adults talked to each child individually and that the other children were in another room playing video games as the children were questioned individually. Mr. Hamer said that after learning of the children's reports of inappropriate touching, he went with Mr. and Ms. Callicutt to the Defendant's apartment. Mr. Hamer said that the Defendant's brother answered the door and that the Defendant would not come to the door. Mr. Hamer said the Defendant was inside the apartment and that the Defendant "talked right then and there." Mr. Hamer said that the Defendant's brother called the police first and that Ms. Callicutt also called the police. Mr. Hamer said Mr. and Ms. Callicutt wore their security guard uniforms during the discussion with the Defendant. Mr. Hamer did not recall the Defendant's "getting hit" and said the police "took [the Defendant] in."

Mr. Hamer testified that the Defendant had asked for J.S. to spend the night at the Defendant's apartment but that Mr. Hamer and his wife had refused because J.S. had

seizures and was nonverbal at the time. Mr. Hamer said that the Defendant later asked for J.H. to spend the night at the Defendant's apartment but that Mr. Hamer and his wife refused.

The Defendant did not offer evidence. The State made the following elections of the offenses:

Count 1: Aggravated sexual battery by touching R.C.1's "behind inside of his clothes when [R.C.1] was sitting in the defendant's lap"

Count 2: Aggravated sexual battery of R.C.2 "with the defendant using his hand to touch [R.C.2] on his posterior while [R.C.2] was sitting on the defendant's lap in the defendant's bedroom"

Count 3: Aggravated sexual battery of J.S. "with the defendant using his hand to touch . . . [J.S.]'s body parts, buttocks, under his clothing in the defendant's bedroom"

Count 4: Aggravated sexual battery of K.C. "described as the defendant using his hand to touch [K.C.'s] buttocks inside of her pants while she was sitting in the defendant's bedroom

Count 5: No election, attempted aggravated sexual battery of R.C.3

Count 6: Solicitation of a minor for aggravated sexual battery of J.H. "described . . . as the defendant requesting [J.H.] to, 'sit on my d---' when [J.H.] and the defendant were in the defendant's bedroom"

After receiving the evidence, the jury found the Defendant guilty of one count each of aggravated sexual battery of R.C.1, R.C.2, J.S., and K.C. The jury also found the Defendant guilty of attempted aggravated sexual battery of R.C.3 and of solicitation of aggravated sexual battery of J.H. At a sentencing hearing, the trial court imposed an effective 110-year sentence. This appeal followed.

The Defendant contends that the evidence is insufficient to support his convictions. He acknowledges that evidence exists of his guilt but argues that it is insufficient to support the convictions because it consists of the uncorroborated testimony of the child victims.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

-11-

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: . . . The victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). "'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" *Id.* § 39-13-501(6). "'Intimate parts' includes semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" *Id.* at (2).

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> . . .
>
> Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a)(3).

> It is an offense for a person eighteen (18) years of age or older, by means of oral, written or electronic communication, electronic mail or internet services, directly or through another, to intentionally command, request, hire, persuade, invite or attempt to induce a person whom the person making the solicitation knows, or should know, is less than eighteen (18) years of age,

or solicits a law enforcement officer posing as a minor, and whom the person making the solicitation reasonably believes to be less than eighteen (18) years of age, to engage in conduct that, if completed, would constitute a violation by the soliciting adult of one (1) or more of the following offenses:

. . .

Aggravated sexual battery, pursuant to § 39-13-504[.]

*Id.* § 30-13-528(a)(4).

We begin by noting that, contrary to the Defendant's assertion that the testimony of a child victim is insufficient, in the absence of corroborating evidence, to support a conviction, the testimony of a victim may provide sufficient evidence, standing alone, to support a conviction. *See, e.g.*, *State v. Bonds*, 502 S.W.3d 118, 146 (Tenn. Crim. App. 2016); *State v. Nance*, 393 S.W.3d 212, 230-31 (Tenn. Crim. App. 2012). In any event, the Defendant's argument is factually flawed. As we will discuss, the victims corroborated one another's accounts, as some of the victims were eyewitnesses to offenses committed against other victims. In addition, Mr. Hamer saw the Defendant's pants unfastened, as testified to by R.C.2.

We note, first, that with respect to all of the victims, the evidence showed that they were under age thirteen at the time of the offenses. The victims' mothers testified about their dates of birth, and the children testified to their ages on the date of the offenses or their ages at the time of the trial.

The jury found the Defendant guilty in Count 1 of aggravated sexual battery of R.C.1. The evidence in the light most favorable to the State shows that R.C.1 testified that the Defendant touched his "behind" under his clothes and that the Defendant kissed R.C.1 on the lips. Ms. Hamer testified that she saw R.C.1 sitting on the Defendant's lap in the bedroom. J.S. testified that he saw the Defendant inappropriately touching R.C.1 on the buttocks, which was consistent with J.S.'s statement in the forensic interview that J.S. saw the Defendant touch R.C.1's buttocks when R.C.1 sat on the Defendant's lap. The evidence is sufficient to support this conviction.

In Count 2, the jury found the Defendant guilty of aggravated sexual battery of R.C.2, who testified that the Defendant touched his posterior while R.C.2 sat in front of the Defendant in a chair. R.C.2 said the Defendant's pants were unzipped and that the Defendant instructed R.C.2 kiss the Defendant using R.C.2's tongue. Mr. Hamer testified that he saw the Defendant's pants unfastened when a child sat on the Defendant's lap, although Mr. Hamer could not recall which child he saw on the Defendant's lap. R.C.3 testified that she saw R.C.2 on the Defendant's lap. R.C.3 also testified that she was present

-13-

when the Defendant instructed R.C.2 to kiss the Defendant, that R.C.2 kissed the Defendant's cheek, that the Defendant told R.C.2 to give the Defendant a real kiss, and that R.C.2 kissed the Defendant's mouth. J.S. stated in his forensic interview and in his testimony that he saw the Defendant touch R.C.2's buttocks when R.C.2 sat on the Defendant's lap. R.C.3 testified that she was present when the Defendant told R.C.2 to kiss the Defendant, that she saw the Defendant kiss R.C.2 on the mouth, and that she saw R.C.2 seated on the Defendant's lap, although she did not see "anything happen." R.C.1 stated in his forensic interview that he saw the Defendant touch R.C.2's middle parts and behind. The evidence is sufficient to support this conviction.

In Count 3, the jury found the Defendant guilty of aggravated sexual battery of J.S., who testified that he and the Defendant were alone in the Defendant's bedroom when the Defendant told J.S. to sit on the Defendant's lap. J.S. said the Defendant touched his buttocks inside his clothes, and he circled buttocks on an anatomical diagram to show where the Defendant had touched him. In addition to J.S.'s testimony, J.H. testified that he saw the Defendant touch J.S.'s buttocks inside J.S.'s clothes. J.H. said he saw the Defendant's thumb sticking out of J.S.'s pants but did not see the rest of the Defendant's hand. R.C.2 stated in his forensic interview that he saw the Defendant touch J.S.'s penis and buttocks outside J.S.'s clothes. The evidence is sufficient to support this conviction.

In Count 4, the jury found the Defendant guilty of aggravated sexual battery of K.C. Although K.C. did not testify, J.H. testified that he was present when the Defendant told J.S. to bring the Defendant a container of baby oil, which the Defendant applied to his finger. J.H. said the Defendant told K.C. to sit on the Defendant's lap but that J.H. told K.C. "no." J.H. said the Defendant "sticked his fingers in [K.C.'s and J.S.'s] butts." J.H. said he saw the Defendant's thumb sticking out of K.C.'s pants but that the rest of the Defendant's hand was inside K.C.'s pants. J.H.'s statements in his forensic interview relative to the Defendant's touching K.C's buttocks were consistent with J.H.'s trial testimony. R.C.1 stated in his forensic interview that the Defendant touched all of the children's middle parts and behinds, and R.C.1 identified K.C. as having been one of the children present. The evidence is sufficient to support this conviction.

In Count 5, the jury found the Defendant guilty of attempted aggravated sexual battery of R.C.3, who testified that the Defendant gave her liquor and slid his hand down her back trying to touch her buttocks but that she left the room to prevent him from touching her buttocks. R.C.3 testified that the Defendant asked all the children to kiss him and told the children "not to tell nobody what had happened." J.S. testified that he saw R.C.3 sit on the Defendant's lap and that the Defendant touched R.C.3 in "the same" areas in which the Defendant touched J.S., which he identified as including his buttocks. R.C.2 stated in his forensic interview that he saw the Defendant touch R.C.3's buttocks. The evidence is sufficient to support this conviction.

In Count 6, the jury found the Defendant guilty of solicitation of a person under age 18 to commit aggravated sexual battery, relative to J.H. In his testimony, J.H. said that while they were in the Defendant's bedroom, the Defendant told him that when J.H. was ready, J.H. could "stick . . . [his] penis in [the Defendant's] butt." J.H. also said that the Defendant forcibly kissed J.H.'s mouth. J.H. also said that the Defendant asked J.H. to "sit closer to" the Defendant's genitalia. J.H. provided a consistent account in his forensic interview. The evidence is sufficient to support this conviction.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE